IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PEOPLE FOR THE ETHICAL TREATMENT
OF ANIMALS, INC.,
501 Front Street,
Norfolk, Virginia 23510,

     *Plaintiff,*

     v.

NATIONAL INSTITUTE OF MENTAL
HEALTH, a federal agency,
6001 Executive Boulevard, Bethesda,
Montgomery County, MD 20892,

NATIONAL INSTITUTES OF HEALTH,
a federal agency,
9000 Rockville Pike, Bethesda, Montgomery
County, Maryland, 20892,

SHELLI AVENEVOLI, Ph.D., in her
official capacity as Acting Director of the
National Institute of Mental Health,
6001 Executive Boulevard, Bethesda,
Montgomery County, MD 20892, and

MATTHEW J. MEMOLI, M.D., M.S., in
his official capacity as Acting Director of the
National Institutes of Health,
9000 Rockville Pike, Bethesda,
Montgomery County, MD 20892,

     *Defendants.*

**Complaint for a Civil Case**

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, by counsel, alleges the following:

[1]

## Introduction

1.     This lawsuit seeks to enforce the fundamental First Amendment right of Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") to receive, without censorship or interference, communications from fellow primates imprisoned and tortured in the laboratory of Elisabeth Murray, Ph.D., at the National Institute of Mental Health ("NIMH") in Bethesda, Maryland.

2.     The First Amendment to the United States Constitution provides PETA a right to receive communications from willing speakers. *See, e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (collecting numerous cases). This right exists regardless of whether the speakers themselves possess First Amendment rights. *See Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) (stating the right to receive publications is a fundamental right, even when the publications themselves may not be protected by the Constitution); *Kleindienst v. Mandel*, 408 U.S. 753, 764–65 (1972) (the First Amendment right to hear is implicated even where the speaker may not have constitutional rights). The First Amendment also protects non-verbal communications as speech. *See Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 218 (4th Cir. 2017) (holding a factfinder could reasonably conclude that a deaf inmate had a First Amendment right to receive communications in prison via videophone); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (First Amendment protected silently raising a fist in protest, which "seems as purely communicative as a sign-language gesture or the act of holding up a sign").

3.     PETA engages in extensive newsgathering and reporting activities as part of its charitable animal protection mission. This includes substantial investigation and reporting on the plight of animals subject to experimentation, including specifically the deprivations and injuries

inflicted on the captive rhesus macaques in Murray's NIMH laboratory. This Circuit has applied First Amendment protections to PETA's newsgathering activities. *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815 (4th Cir.), *cert. denied*, 144 S. Ct. 325 (2023) (enjoining North Carolina's application of a law to PETA's newsgathering activities).

4.      Newsgathering serves a particularly powerful function under the First Amendment when seeking access to incarcerated beings whose voices are otherwise silenced, to ascertain information about their conditions. *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) ("Many categories of noninmates seek access to prisons. Access is essential … to journalists seeking information about prison conditions") (citing *Pell v. Procunier*, 417 U.S. 817 (1974)); *see also Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 873 (9th Cir. 2002) (affirming judgment enjoining prison officials from preventing uninterrupted viewing of inmate executions including initial procedures, on the grounds that the public and the press have a First Amendment right to view government proceedings).

5.      The captive rhesus macaques, including but not limited to Beamish, Sam Smith, Guinness, Nick Nack, and Cersei in Murray's NIMH laboratory are willing speakers under the First Amendment, regularly communicating about their physical and psychological pain and suffering through vocalizations, facial expressions, head and limb movements, body postures, and stereotypical[1] (that is, repetitive abnormal and often self-injurious) behavior indicating anxiety and depression (including pacing, rocking, pulling out their hair, and biting their flesh).

---

[1] Stereotypical behaviors ("stereotypies") serve no functional purpose. They increase when the animal is having a negative experience and are understood to develop as a means of coping with the stress of captive conditions. Stereotypies are learned repetitive behaviors indicating compounded and persistent stress. They can include rocking, pacing, bar biting, self-injury, over grooming, jumping, spinning, and more. *See* Exhibit 4, Declaration of Dr. Elizabeth Tyson (Director of Animal Welfare and Advocacy at Born Free USA, and expert in care and rehabilitation of nonhuman primates) ¶ 25.

6.      By these communications, these individuals are expressing the pain, suffering, stress, fear, and depression they endure, and begging for the torment to stop. In Murray's laboratory, the macaques' communications seldom, if ever, reach the sympathetic ear of a listener ready and willing to provide the help they seek. While many communications from macaques can be understood by the average viewer without expert interpretation, PETA employs and has relationships with renowned primate experts capable of better understanding the significance of the rhesus macaques' communications, and what they indicate about the conditions of their confinement. These include outside experts like Dr. Agustín Fuentes, a Princeton University professor with particular expertise in macaques' interactions with humans, and Dr. Elizabeth Tyson, an Oxford Centre of Animal Ethics Fellow with a Doctorate in Animal Welfare Law from the University of Essex and Director of one of the largest primate sanctuaries in the United States, who authored declarations attached to this Complaint.

7.      PETA has a right to receive those communications in real time directly from the macaques and to report the information received to the American people in order to inform the public discourse on the highly controversial and much-criticized issue of government-funded experiments on animals. Without these communications, the public will remain inadequately informed about the circumstances of their fellow primates.

8.      This lawsuit follows the Defendants' refusal of PETA's August 5, 2024 written request for reasonable, uncensored, and unedited access to a live-streamed audiovisual feed of the rhesus macaques in Murray's laboratory in order to receive the macaques' communications and exercise its First Amendment right to listen.[2] Defendants also refused PETA's offer in this letter

---

[2] Upon information and belief, the communications sought contain no trade secret or otherwise confidential information. As explained in PETA's request, PETA is willing to accommodate Defendants in the implementation of appropriate procedures to protect the identities of their staff as part of the real-time audiovisual feed permitting PETA to receive the macaques' communications.

to cooperate in devising any alternative means for PETA to meaningfully access the macaques' communications in real time without government interference. PETA's August 5, 2024 letter is attached as Exhibit 1. Defendants' October 1, 2024 response refusing PETA's request is attached as Exhibit 2.

9.      PETA seeks an order from the Court: (i) declaring that Defendants' refusal to allow the requested access to a live-streamed audiovisual feed of the rhesus macaques' communications in Murray's laboratory violates the First and Fifth Amendments; (ii) enjoining that violation; and (iii) requiring constitutionally sufficient means for PETA to receive the macaques' communications.

## Jurisdiction and Venue

10.      This is a civil action that raises a federal question under the Constitution of the United States, based upon the federal Defendants' violation of the Plaintiff's rights under the First and Fifth Amendments. Jurisdiction therefore exists pursuant to 28 U.S.C. §§ 1331, 1361, and 2201.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b, e) and 5 U.S.C. § 703 because Defendants include employees or officers of the United States, acting in their official capacity. Additionally, Defendants and Murray's laboratory and the macaques whose communications are at issue in this case are all located in Bethesda, Maryland, which is in this District.

## Parties

### *Plaintiff*

12.      Plaintiff PETA is a Virginia non-stock corporation, exempt from federal taxation pursuant to Internal Revenue Code § 501(c)(3), and an animal protection charity based in Norfolk,

Virginia. Since its founding in 1980, PETA has worked to protect animals from abuse, neglect, and cruelty—including in laboratories—through its myriad charitable programs, including newsgathering and reporting, public education, advocacy, research, and animal rescue. PETA also regularly provides law enforcement and regulatory authorities with evidence of animal abuse and other misconduct by personnel in laboratories in order to end those practices.

*Defendants*

13.    Defendant NIMH, part of the National Institutes of Health ("NIH"), is a federal agency responsible for the macaques at issue in this case and controlling the facilities that house them. NIMH's annual budget authority for fiscal year 2023 was over two billion dollars. It has used that budget, in part, to conduct experiments on primates in its Maryland laboratories, including the repetitious and invasive physical, psychological, and neurological experiments on cage-confined rhesus macaques, for more than four decades.

14.    Defendant NIH is part of the United States Department of Health and Human Services ("DHHS"). NIH is the primary federal agency responsible for medical research, including experiments on animals. With an annual budget exceeding $45 billion, nearly half of which involves animal experimentation despite the prevalence of state-of-the-art animal-free methodologies in use elsewhere, NIH also confines and experiments on hundreds of thousands of animals in its own laboratories. In NIH's Maryland laboratories alone, over half a million animals are confined for use in experiments.

15.    Defendant Shelli Avenevoli, Ph.D., is the Acting Director of NIMH and is sued in her official capacity. Defendant Avenevoli has authority over all NIMH policies and practices, including those challenged in this action.

16.    Defendant Matthew J. Memoli, M.D., M.S., is the Acting Director of NIH and is sued in his official capacity.  Defendant Memoli has authority over all NIH policies and practices, including those challenged in this action.

### General Allegations

*Rhesus Macaques Are Highly Complex, Social Primates with an*
*Extensive Range of Communication Methods[3]*

17.    Communication among nonhuman primates is well documented and accepted. Primates communicate to satisfy their biological and social needs, such as avoiding predators, interacting with other group members, or maintaining cohesion during travel.  To these ends, they use a range of different signals.  For example, field studies of Japanese macaques show that this species uses different dialects depending on where they live,[4] and other studies show Campbell's monkeys in Africa can use suffixes to change the meaning of certain calls.[5]

18.    Visually, primates use a range of facial expressions and bodily gestures as communicative signals, which have been the focus of extensive research.

19.    For many primates, vocalizations are a primary means for communication and tend to be species-specific.

20.    Rhesus macaques (*Macaca mulatta*), the species imprisoned in Murray's laboratory, are the most commonly used primates in experiments[6] and one of the most-used

---

[3] *See generally* Exhibit 3, Declaration of Dr. Agustín Fuentes (Princeton University professor of anthropology, and expert in primatology, including macaques and their interactions with humans); and Exhibit 4, Declaration of Dr. Elizabeth Tyson.
[4] Hideki Sugiura, Toshiaki Tanaka, and Nobuo Masataka, *Sound Transmission in the Habitats of Japanese Macaques and its Possible Effect on Population Differences in Coo Calls*, Vol. 143 Issue 8 BEHAVIOUR 993-1012 (Aug. 2006), available at http://www.jstor.org/stable/4536390.
[5] Karim Ouattara, Alban Lemasson, and Klaus Zuberbuhler, *Campbell's Monkeys Use Affixation to Alter Call Meaning*, 4:11 PLOS ONE 7808 (Nov. 2009), available at https://doi.org/10.1371/journal.pone.0007808.
[6] Darcy L. Hannibal *et al.*, *Laboratory Rhesus Macaque Social Housing and Social Changes: Implications for Research* (2017), available at https://perma.cc/T5J3-MYPV.

primate species in purported studies of depression and anxiety.[7] They are highly intelligent,[8] have complex social behavior repertoires, and are naturally social animals.[9]

21.    Scientists have, for years, studied nonhuman primates', including macaques', abilities to communicate with humans.[10] Rhesus macaques can communicate effectively and intentionally with humans, including goal-directed communication—which attempts to evoke a response in the recipient.[11]

22.    In nature, macaques live in profoundly social environments with complex dynamics among their families and greater communities with established hierarchies. They select their friends, mates, and enemies, which may change over time. These aspects of their lives are fundamental needs.[12]

23.    Rhesus macaques spend significant time engaging in allogrooming, or social grooming, as one of the main behaviors they exhibit to establish and strengthen social relationships with others in their communities. They often sleep huddled together in groups of two to four, in elevated positions such as cliffs, branches, and within mangrove trees to avoid ground-dwelling predators.

24.    Like all primates, including humans, rhesus macaques communicate by a diverse set of facial expressions, body postures, manual gestures, and vocalizations combined with

---

[7] Karla K. Ausderau *et al.*, *Evaluating depression- and anxiety-like behaviors in non-human primates* (2023), available at https://perma.cc/44E4-DMYL.

[8] In fact, last year, 43 rhesus macaques escaped from a research facility in South Carolina. *See* Lucia Suarez Sang & Stephen Smith, *What we know after 43 monkeys escaped a South Carolina research facility*, CBS News (Nov. 19, 2024, 9:20 AM EST), available at https://perma.cc/WT9J-DXEV.

[9] Dario Maestripieri & Christy L. Hoffman, *Behavior and Social Dynamics of Rhesus Macaques on Cayo Santiago*, in *Bones, Genetics, and Behavior of Rhesus Macaques: Macaca Mulatta of Cayo Santiago and Beyond* (Qian Wang ed., 2012).

[10] *See, e.g.*, Adwait Deshpande, Shreejata Gupta, and Anindya Sinha, *Intentional Communication Between Wild Bonnet Macaques and Humans*, 8:5147 SCI. REP. 1 (Apr. 2018) (describing a study on food-requesting communications in wild macaques interacting with humans), available at https://rdcu.be/d7gfU.

[11] Exhibit 3 (Fuentes Decl.) ¶ 5.

[12] Exhibit 4 (Tyson Decl.) ¶ 17.

various mouth positions. Examples include lip-smacking, teeth-chattering, puckered lips, grimacing, teeth-baring, and open mouths. They also move their ears, eyebrows, heads, and tails as methods of communication.

25.    Their gaze is another important communication tool to appear either friendly or threatening.

26.    As referenced above, vocalizations are a vital but far from exclusive means of macaque communication. As a sign of aggression, rhesus macaques can engage in vocalizations known as "barks," where their jaws are a bit wider than with other vocalizations. When they feel threatened or under attack, they produce a more high-pitched scream, retracting their lips and partially separating their teeth.

27.    For young macaques in stressful situations, "gecker" vocalizations are produced. These are loud, pulsed sounds that can trigger a response from the mother, so young macaques use it as a means to attract their mother's attention.

28.    Rhesus macaques also use vocalizations such as coos and grunts during affiliative interactions and while moving. These sounds are used for a variety of reasons, including to communicate about food location, predators of various kinds (land, air, and arboreal) nearby, and more.

*Murray's Torturous and Useless Experiments on Rhesus Macaques*

29.    Murray has spent more than 40 years and over $50 million taxpayer dollars isolating, caging, and then deliberately damaging macaques' brains without leading to any new treatments or cures for mental health issues in humans.[13]

---

[13] Dr. Katherine Roe, *Bad Science and Bad Ethics: NIH's Monkey Fright Experiments Have It All!*, PETA.org, (Apr. 19, 2022), available at https://perma.cc/PD9F-3RGV.

30.    Many macaques in her laboratory are subjected to multiple major surgeries, including brain surgeries that inflict permanent damage (brain lesion surgeries), head-post implantation surgeries, and cranial chamber placement surgeries.

31.    In her typical experiments, as revealed by public records and on information and belief, Murray and her staff engage in a number of tortures, first among them being what is euphemistically called a craniotomy. An anesthetized macaque is confined in a miserable restraint apparatus known as a stereotaxic device, which has pointed eye bars, ear bars, and bite bars to immobilize the head, as shown in the following exemplar images:[14]



32.    These experimenters then cut through the skin and muscle on the monkey's head to expose the skull, drill a pilot hole into the skull, and insert a saw into the hole to remove a large portion of the skull to expose the brain for experimentation.

33.    Murray and her staff then cause irreversible brain damage by suctioning and burning out portions of the brain, or alternatively by directly injecting a neurotoxin, such as ibotenic acid, into the brain, causing cell death.

---

[14] Colin A. Roopnariane, *et al.*, *Quadrature RF Coil for In Vivo Brain MRI of a Macaque Monkey in a Stereotaxic Headframe*, 41B(1) CONCEPTS IN MAGNETIC RESONANCE Part B. 22-27 (2012), available at https://doi.org/10.1002/cmr.b.21205.
While Defendants have not produced images of their own surgical experiments in response to FOIA requests, on information and belief, these images from the same procedures in other laboratories provide a close approximation of the reality faced by the macaques in Murray's laboratory.

34.    Some macaques in Murray's laboratory have been forced to endure multiple brain damage surgeries as Murray and her staff often repeat these surgeries to damage multiple lesions in an individual monkey.

35.    In some macaques, Murray and her staff perform another major surgery to insert a metal chamber into a macaque's skull to allow for repeated direct access to damage their brains in one experiment after another or to insert recording or other equipment.  The chamber is attached by twelve to fifteen screws screwed directly into the monkey's skull.

36.    In yet another major surgery, Murray and her staff install a steel head post into the macaque's head to restrain and immobilize him or her, sometimes for hours, during experiments in which the macaque is forced to watch a computer screen or other device.  Like the chamber, the head post is screwed directly into the skull.  There is no reliable way to determine or measure the level of pain and suffering they feel after implantation.

37.    The head post and chamber, comparable to those used in Murray's laboratory, are shown below, in exemplary images from another facility:[15]



Head post    Chamber

---

[15] Xing Chen *et al.*, *3D Printing and Modeling of Customized Implants and Surgical Guides for Non-Human Primates*, 286 J. NEUROSCI. METHODS, 38-55 (July 2017), available at 10.1016/j.jneumeth.2017.05.013.

38.    Some macaques have both a chamber and a headpost screwed into their skulls, as shown in the following exemplar image from another facility:[16]



39.    After the anesthesia wears off from these procedures, government records indicate that the macaques receive insufficient pain relief and may suffer continued pain as they bang, bump, or hit the headpost or chamber against their cages and commonly suffer from recurring infections caused by the foreign objects screwed into their skulls.

40.    The monkeys are sometimes subjected to additional surgeries to remove bone and skin that have grown into the chambers and to address the recurring infections.

41.    Murray and her staff perform these surgeries and repeat the behavioral experiments until a macaque is no longer usable because he succumbs to infection, or another ailment, or is otherwise useless for additional experiments.  Then they kill and discard the macaque.

42.    Murray and her experimenters also, as revealed by public records, subject the macaques to psychological trauma in the form of fright experiments in which the macaques are intentionally exposed to fear-inducing experiences such as life-like replicas of snakes, spiders,

---

[16] *The Myths of Animal Research Opponents – The Reality of the Max Planck Institute*, MAX PLANCK INSTITUTE FOR BIOLOGICAL CYBERNETICS (2018), available at https://perma.cc/XZT8-YYSB.

and other natural predators or threats that frighten the macaques presented just outside their testing cages.

43.    Adding to their torment, as revealed by public records, the macaques are also subjected to what is sadistically called the "lunch box procedure" in which they are deprived of food and water for 24 hours or more to force them to perform tasks, then "rewarded" with food but given only fifteen minutes to consume it.  Bouncing from ravenously hungry to unpleasantly full in a matter of minutes, they can suffer from bloating and gastrointestinal discomfort.[17]  They are forced to choose between gnawing hunger and unquenched thirst or forced cooperation with their captors and the infliction of more anxiety, torment, and pain.

44.    Throughout their ordeal, the macaques, naturally highly social beings, are held in solitary, cramped metal cages with slatted metal bottoms through which their feces and urine fall, but the smell from which they cannot escape.  On information and belief, the cages are barely larger than their bodies and afford no comfort to them except a metal sleeping platform.  This causes them severe psychological and physical suffering.  Their suffering is compounded by the constant discomfort of being unable to perform normal functions such as stretching, climbing, or walking.

45.    Based upon public records of 73 monkeys imprisoned by the Defendants in Murray's laboratory, 64 percent of them were deprived of water and 48 percent were deprived of food to force them to cooperate in experiments; experimenters filed down the teeth of more than half the monkeys; 85 percent of the monkeys suffered from hair loss (a condition associated with extreme psychological distress); 29 percent experienced lack of appetite indicative of severe depression; 19 percent were underweight; 64 percent were overweight (likely stemming from

---

[17] *See* Dr. Katherine Roe, *Review of Neuropsychology Experiments on Rhesus Macaques* (Mar. 2021), available at https://perma.cc/8T2Q-4P8Y.

being caged with no opportunity for exercise, exploration, or meaningful stimulation); 45 percent sustained physical injuries including severed fingertips, puncture wounds, and lacerations that required stitches; and nearly 18 percent of the monkeys suffered from diarrhea or loose stool.

46.    Murray's cruel experiments fail to yield meaningful or useful results in large part because the brain abnormalities associated with most neuropsychiatric illnesses are not comparable to the type of brain damage Murray and her staff inflict upon the monkeys. The inefficacies are compounded by variable rearing conditions and fundamental differences between gene expression in humans versus monkeys.[18]

*The Tragic Stories of Beamish, Sam Smith, Guinness, Nick Nack, and Others*

47.    While Beamish, Sam Smith, Guinness, and Nick Nack are distinct individuals, each suffering in their own way, their stories below are tragically typical. Upon information and belief, Defendants have subjected hundreds of primates to similar fates in Murray's laboratory alone. Each has had their own story to tell if only those with the desire and right to receive them would be allowed to.

48.    Using the limited and constitutionally insufficient means available to it, PETA has investigated and reported, based on government documents, the harrowing lives of several macaques tortured by Murray and her staff, including ones named Beamish, Sam Smith, Guinness, and Nick Nack, who are, on information and belief, still imprisoned in Murray's laboratory, and are willing speakers continually communicating about their torment.

49.    Born in 2005, Beamish was two years old when he was shipped to NIH to be infected in virus experiments. Upon information and belief, he has spent sixteen years confined to a small, barren metal cage, mostly in a solitary cage. He has been used by three different

---

[18] *Id.* at 3-4.

experimenters, including Murray, to whose laboratory he was sent when he was only five years old.  Murray and her staff have cut into his skull, suctioned out part of his brain, injected his brain with toxins, and subjected him to fright experiments.   For years, he has endured multiple mutilating injuries to his fingers, rectal prolapse (where part of the large intestine falls outside of the anus, a condition often caused by extreme stress), suffered from chronic diarrhea, skin conditions, and severe hair loss, according to NIH clinical records, reports, and other laboratory records.  His records also revealed that at one point, he was missing up to 73 percent of his body hair, evidence of extreme trauma and stress.[19]   He circles endlessly in his small testing cage evidencing his mental and psychological anguish.



50.      Sam Smith was born at a notorious monkey breeding facility in South Carolina and was boxed up and shipped to NIH when only two years old, where he has been imprisoned in a small metal cage for fifteen years. Murray and her staff have suctioned out portions of his brain and injected his brain with toxins. An MRI revealed that an experimenter cut a blood vessel during one procedure causing blood to pool inside his skull, resulting in him being strapped down and

---

[19] *A Life of Pain and Misery: Meet Beamish, a Monkey Prisoner at NIH*, PETA.org, available at https://perma.cc/B7HG-55MY.
[20] Image captured from video footage of Beamish in Murray's laboratory on March 30, 2016, obtained by PETA through FOIA.

his skull cut open again to remove the fluid. NIH laboratory observation and behavioral history assessment records show he has been found curled up in a fetal position, or rocking back and forth, desperate to soothe himself. He has also been found injured or bleeding in his cage and rips out his own hair from his shins, tail, back, and cheeks, evidencing severe psychological torment.[21]



51.     Guinness was brought to Murray's laboratory at two years old and has been there for sixteen years, kept in solitary cages for more than twelve years. According to NIH laboratory documents cataloging procedures inflicted upon him, he was fitted with a titanium head post embedded in his skull and a tight metal collar to enable experimenters to control him, even when he tries to resist. He has been subjected to fright experiments and rips his hair out, circles repeatedly in his cage, rocks back and forth in his cage evidencing extreme fear and stress, and repeatedly claws at the sides of his cage.[23]

---

[21] Evelyn Wagaman, *Starvation, Isolation, Surgeries, Restraint: This Is Sam Smith's Story*, PETA (May 4, 2022), available at https://perma.cc/R2NA-67W6.
[22] Image captured from footage of Sam Smith in Murray's laboratory on March 25, 2016, obtained by PETA through FOIA.
[23] Evelyn Wagaman, *Used, Abused, and Traumatized: Meet Guinness, a Monkey Prisoner at NIH*, PETA (Nov. 16, 2021), available at https://perma.cc/8SUL-MQV2.



52.    NIH laboratory and medical records reveal that after Defendants subjected Nick Nack to the same horrors described above, he languished in his solitary cage, lost his appetite, lost weight, and lost much of his hair to the stress and trauma of the torture Murray and her staff have inflicted on him.[25]  He jumps up and down repeatedly, facing the rear of his cage, in extreme psychological distress—a stereotypical behavior Nick Nack performs approximately 50 percent of his time on camera in videos obtained by PETA through FOIA.



---

[24] Image captured from video footage of Guinness in Murray's laboratory, obtained by PETA through FOIA.
[25] Evelyn Wagaman, *Nick Nack's Story: Caged, Cut Open, and Traumatized in an NIH Laboratory*, PETA (Mar. 15, 2022), available at https://perma.cc/9Y25-L8WU.
[26] Image captured from video footage of Nick Nack in Murray's laboratory on March 23, 2016, obtained by PETA through FOIA.

53.    Beamish, Sam Smith, Guinness, and Nick Nack are far from alone in their suffering. Many other macaques remain imprisoned in Murray's laboratory, including, for example, Cersei. As shown by NIH laboratory records, Murray and her staff installed Cersei's head chamber in January of 2021 and subjected her to a craniotomy the following month. In the months and years that followed, laboratory staff—as reported in a slow trickle of public records produced years after the fact—observed numerous conditions, including bruising, an inflamed abrasion, inappetence, and an umbilical hernia. In one instance, she was left to languish with dried blood on her face and in her cage for multiple consecutive days. Records show repeated signs of infection at the site of her head chamber, and reflect that experimenters put her "on water control."[27] She, too, suffered hair loss from her traumatic experiences in the laboratory—at times missing up to 73 percent of her hair.

*Rhesus Macaques Confined in Murray's Laboratory Are Willing Speakers.*

54.    In nature, scientists have observed macaque communications ranging from reflexive to intentional (communicating one's intentions and goals to a listener; providing specific information to an audience). Macaques also communicate intentionally through gestures towards the scientists studying them in the wild, including by using purposeful limb, head, or body movements, and numerous sounds, facial expressions, and gestures.[28]

55.    NIH admits that animals held captive in government laboratories communicate effectively with humans. NIH's *Guide for the Care and Use of Laboratory Animals* (Lab Animal

---

[27] "Water control" refers to a practice in which experimenters restrict the animals' access to water prior to behavioral training or testing, to increase the value of small drops of liquid or juice (usually 0.5ml) provided to the animal for successfully performing an experimental task, such as pressing a button or fixating on an image on a computer screen.

[28] Raphaela Heesen *et al.*, *Primate communication: Affective, intentional, or both?*, at 11, 13; PRIMATE COGNITIVE STUDIES (B. L. Schwartz & M. J. Beran eds., 2022) (citing Byrne *et al.*, 2017), available at https://www.researchgate.net/publication/352957636.

Care and Use Guide)[29] explains that certain "species-specific behavioral manifestations," including "vocalization" and "abnormal [] posture," "are used [by animal experimenters] as indicators of [captive animals'] pain or distress."

56.     Rhesus macaques in Murray's laboratory are willing speakers because they communicate intentionally and, on information and belief, do so continually throughout their confinement at the hands of Defendants.

57.     Public NIH behavioral history records, laboratory observation logs, and other records obtained by PETA confirm NIH experimenters have observed macaque communications in the forms of abnormal behaviors and gestures such as rocking back and forth in the fetal position, pacing, circling, ripping out their own hair, and vigorously shaking cage bars and walls.

58.     Several videos of the macaques held in Murray's laboratory obtained by PETA show these macaques communicating through numerous additional methods, including smacking their lips, grimacing, turning away from frightening stimuli, shaking their cages, and reaching out through the cage bars, apparently pleading for help.[30]

59.     The macaques' gestures and body language communicate intelligible messages about their torment in Murray's government laboratory, and at NIH and NIMH laboratories generally: messages that PETA has a constitutional right to receive and report.

60.     Dr. Fuentes' expert declaration (Exhibit 3) confirms the following key factors regarding the communications of Beamish, Sam Smith, Guinness, and Nick Nack, based upon his review of the limited video footage obtained by PETA through FOIA:

---

[29] *See* NIH: National Research Council of the National Academies, GUIDE FOR THE CARE AND USE OF LABORATORY ANIMALS, 120–21 (8th ed. 2011), available at https://perma.cc/5NAA-NM3M.
[30] Exemplary footage of Guinness, Sam Smith, Beamish, and Nick Nack in Elisabeth Murray's Laboratory, obtained by PETA through FOIA, is available at https://www.youtube.com/watch?v=Od-aBOaodM8.

a. Macaque communications would be recognizable to macaque experts like him given the appropriate quality, nature, and scope of video footage;

b. In the footage presented, the macaques exhibited a range of characteristic stress and fear responses and, if accompanied by more expansive video footage showing their surroundings, their responses could be better assessed and cataloged;

c. Their behaviors exhibited in the existing footage already recognizably reflect nervousness, fear, agitation, and a desire to escape confinement;

d. The existing footage in PETA's possession nevertheless presents substantial barriers to the accurate assessment and observation of potential communications; and

e. More comprehensive audio-visual footage of the macaques is necessary to permit accurate assessment and interpretation of their communications, especially live footage to interpret the macaques' real-time communications under varying conditions, in different environments, and outside of active experiments.

Ex. 3 (Fuentes Decl.) ¶¶ 21-28.

61.    Dr. Tyson's expert declaration (Exhibit 4) confirms additional key factors regarding the communications of Beamish, Guinness, Sam Smith, and Nick Nack, based on her review of the same footage:

a. The macaques exhibit a host of concerning communicative behaviors ranging from attempts to escape their cages and turning away from stimuli, to lip-smacking and teeth-baring yawns;

b. Through these and other behaviors, the macaques are communicating that they are in significant, ingrained, and long-standing distress.

Ex. 4 (Tyson Decl.) ¶¶ 31-37.

[20]

*PETA Has No Constitutionally Sufficient Alternative Means of Obtaining*
*Communications from the Macaques in Defendants' Laboratories.*

62.     It is self-evident that PETA's receipt of certain limited public records via the Freedom of Information Act ("FOIA") does not and cannot satisfy PETA's First Amendment right to receive communications directly from willing macaque speakers in Defendants' laboratories.

63.     While FOIA is the only currently available means for PETA to obtain audiovisual recordings of macaque communications, Defendants determine when, what, and whom to record and what to do with those recordings. Defendants do not photograph or video-record the macaques' communications while pulling them from their cages, strapping them down, immobilizing them, nor during the long periods they are solitarily confined to their barren cages suffering from the effects of their torture.  In an interview for the NIH History Office, Murray admitted refraining from doing so in fear of such records "falling into the wrong hands," apparently referring to PETA and other animal protection advocates who would report on the macaques' torment in her laboratory.[31]

64.     The limited experiment recordings depicting Beamish, Sam Smith, Guinness, and Nick Nack were created, censored, and edited by Defendants' staff.

65.     NIH *Guidelines for Collecting and Releasing Animal Images and Audio Recordings* (Guidelines)[32] make clear the government censorship, noting that photographs, video, and audio recordings of animals must be "reviewed for substantiative content" and will be "administratively approved" only if the agency determines that the material is "appropriate[] . . . for [the] intended

---

[31] *Dr. Elisabeth Murray Oral History 2002*, NIH OFFICE OF HISTORY (2002), available at https://perma.cc/9U2Z-NEW2 ("[W]e don't usually take photos of [surgery or hands-on work] because we are all afraid they'll fall into the wrong hands.").
[32] NIH, GUIDELINES FOR COLLECTING AND RELEASING ANIMAL IMAGES AND AUDIO RECORDINGS (Dec. 19, 2019, as revised Jun. 28, 2023), available at https://perma.cc/5JPU-WDBL.

audience[,]" and that "animal image modifications [may be] required as a condition of release and distribution approval."[33]

66.    In the Defendants' October 1, 2024, refusal of PETA's reasonable request for unrestricted and uncensored audiovisual access to the macaques' communications (Exhibit 2), they confirmed the extent of their censorship.

67.    The Defendants confirmed that the macaques' housing area "does not utilize audiovisual technology"; "[t]here is no audiovisual recording produced" from the closed-circuit television monitoring of macaques while in touch-screen experiments; "there is no audiovisual recording of the actual images captured by the cameras" that are focused only on the eyes of macaques recording pupil diameter changes during an experiment; and that recordings of two macaques interacting with each other during another experiment "are not retained after verification…of the final note file" by research staff.[34]

68.    The only "alternative" suggested by Defendants was for PETA "to submit a FOIA request for any audiovisual recordings or corresponding files of the rhesus macaques in Dr. Murray's laboratory that are available at the time of the request."  However, PETA has already submitted FOIA requests, which NIH officials state they have completed and fulfilled in their entirety, and to which such recordings or files would have been responsive.  This includes a recent PETA request for all photographic and videographic records collected for projects for which Murray was the Principal Investigator or Co-Principal Investigator, which yielded only 25 minutes of video footage of only one macaque with no audio.[35]  The futility of this alternative is further

---

[33] *Id.*
[34] Defendant NIMH reiterated this position in a recent response to a FOIA request from PETA.  *See* Letter from Lisa Alberts, FOIA Coordinator, NIMH, to Kaylie Flaugher, Exec. Coordinator to the Vice Presidents, PETA Laboratory Investigations Department (Dec. 6, 2024) (attached as Exhibit 5) ("[Experimenters] view but don't keep any videographic content").
[35] *See id.*

underscored, as noted above, by Defendants' admission that no responsive materials currently exist, and will not at any foreseeable point in the future.

69.    Documents describing the macaques' communications obtained pursuant to FOIA are likewise constitutionally insufficient. It is the Defendants' experimenters and other employees who determine whether to create a record in the first instance, what to include in and exclude from such records, and whether to destroy the records if there is no pending FOIA request for the records.[36] These censored documents are a wholly inadequate alternative to PETA receiving real-time communications directly from the macaques.

70.    Moreover, as elaborated below, FOIA is a cumbersome and time-consuming process, with Defendants routinely flouting or otherwise omitting FOIA requirements and deadlines and engaging in intentional obstruction often necessitating long, drawn-out litigation before releasing records.

71.    Defendants' refusal to open a channel of communication between PETA and the primates confined in their laboratories prevents PETA from receiving uncensored communications from those primates to which PETA is constitutionally entitled and cannot otherwise obtain.

*Defendants Have Continuously Obstructed PETA's Advocacy and Access to Public Records Concerning Primates Confined in Their Laboratories.*

72.    In addition to the futility and non-applicability of FOIA in this context, it is also the case that Defendants have repeatedly forced PETA to dedicate its charitable resources to enforcing its FOIA and First Amendment rights both in and out of court, further hampering its newsgathering, reporting, and advocacy work.

73.    Defendants are determined to hide what goes on in their animal experimentation laboratories from the public, PETA, and other animal advocates. At every turn, Defendants have

---

[36] *See id.*, indicating that NIMH routinely deletes videographic content.

attempted to obstruct PETA's advocacy by denying it prompt access to public records, blocking its comments from social media, and even barring a PETA executive from a NIMH event at which she was invited to speak.

74.    NIH has often failed to respond to PETA's reasonable FOIA requests seeking documents about taxpayer-funded experiments, in some cases for well over a year despite the statute's "20 business day" response time requirement.

75.    PETA has had to sue NIH several times to compel release of public records. *See e.g.*, Complaint at 1, *PETA v. U.S. Dep't of Health & Human Servs.*, Case No. 1:21-cv-01241-RC (D.D.C. May 6, 2021) (challenging NIH's unreasonable withholding, for over a year, of public records regarding various experiments on primates); Complaint at 1, *PETA v. U.S. Dep't of Health & Human Servs.*, Case No. 1:17-cv-01395 (D.D.C. July 14, 2017) (challenging NIH's unreasonable withholding, for over a year, of public records regarding maternal deprivation experiments inflicted upon rhesus macaques); Complaint at 1, *PETA v. U.S. Dept. of Health & Human Servs.*, Case No. 1:10-cv-01818-JDB (D.D.C. Oct. 27, 2010) (challenging NIH's unreasonable withholding, in some instances for over four years, of public records regarding investigation into alleged Animal Welfare Act violations in animal experimentation laboratories).

76.    PETA engaged in years-long litigation against DHHS seeking public records from Murray's laboratory after the agency refused to respond to seven separate requests. Only after PETA sued in 2021 did the agency begin responding, and only finally fulfilled its production obligations in October 2024.

77.    In another instance, NIH attempted to charge PETA approximately $100,000 to release public video records responsive to FOIA requests regarding traumatic experiments inflicted on baby monkeys.[37]

78.    NIH unconstitutionally targeted critical speech on its public social media platforms through keyword blocking, restraining PETA's speech and inhibiting PETA's campaigns to hide the truth of NIH-led experiments on animals.[38] PETA sued NIH under the First Amendment after receiving documents through a FOIA request confirming that NIH automatically blocked comments with words including, but far from limited to, "animal," "monkey," "experiment," and "testing" from its public social media forums to suppress free speech, legitimate inquiry into, and criticism of its experiments on animals.    Nearly three years later, the U.S. Court of Appeals for the D.C. Circuit granted summary judgment in PETA's favor, confirming that NIH violated the First Amendment by blocking criticism of animal testing.[39]

79.    NIH even barred a PETA executive from its campus based on the content of her advocacy for PETA against NIH's experiments on animals.    In February 2023, NIH denied PETA Vice President for Laboratory Investigations Cases, Dr. Alka Chandna, access to attend a National Advisory Mental Health Council meeting, to which she was invited to speak about macaque Sam Smith's traumatic history in NIH custody.    Only minutes before the meeting, NIMH campus security guards informed Dr. Chandna that she was banned from campus based on "what was on the flyers" she had posted lawfully on campus bulletin boards months before, with messaging critical of NIH's experiments on animals.    Only after PETA threatened legal action did NIH

---

[37] Sara Oliver, *PETA Works to Make Sure Open Records Laws Protect Public's Right to Know*, PETA.org (Mar. 16, 2022), available at https://perma.cc/T3C3-N5MJ.

[38] Elena Waldman, *NIH Blocks Comments Criticizing Cruel Tests on Animals from Its Social Media—PETA Takes Action*, PETA.org (Sept. 9, 2021), available at https://perma.cc/J7BK-6ZN2.

[39] *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627 (D.C. Cir. 2024).

apologize for the blatant First Amendment violation, incredibly stating that it occurred due to a "miscommunication."[40]

80.    Given the above, PETA understands that it can only vindicate its rights to access and report on the communications of Beamish, Sam Smith, Guinness, and Nick Nack, including gestures and body language, by receiving these communications directly—without undue government censorship of their circumstances.

*Experimentation on Animals Is Highly Controversial and the Subject of Extensive Public Debate and Criticism, Requiring Robust First Amendment Protection for Newsgathering and Reporting.*

81.    The subject of humans, one animal species among many, experimenting on others is highly controversial and the subject of extensive public debate and media coverage in the United States and around the world.

82.    A 2024 Morning Consult Poll found that approximately 85 percent of Americans agree that "government funding should prioritize research methods that do not involve animal testing" and "animal experimentation should be phased out in favor of more modern research methods."[41] This survey represents the continuing shift away from animal research, with a 2018 Pew Research Center poll finding that 52 percent of U.S. adults opposed experiments on animals.[42]

---

[40] *Facing Lawsuit, NIH Apologizes for Barring PETA VP from Public Meeting*, PETA.org (Feb. 15, 2023), available at https://perma.cc/3DF9-Y2W9.
[41] Physicians Committee for Responsible Medicine, *Physicians Committee Survey Finds Most Americans Favor Ending Animal Research*, GOOD SCIENCE DIGEST (Oct. 2, 2024), available at https://perma.cc/3THE-D7JY.
[42] Cary Funk & Meg Hefferon, *Most Americans Accept Genetic Engineering of Animals That Benefits Human Health, but Many Oppose Other Uses*, Pew Rsch. Ctr. (Aug. 16, 2018) ("The survey finds that [] 52% of Americans [] in general oppose the use of animals in scientific research."), available at https://www.pewresearch.org/science/2018/08/16/most-americans-accept-genetic-engineering-of-animals-that-benefits-human-health-but-many-oppose-other-uses/.

83.    Despite majority public opposition, and in an age of superior alternatives including advanced simulators, computer modeling, artificial intelligence, 3-dimensional bioprinting, bioinformatics, human organs on chips, and extensive human clinical and epidemiological information, each year, more than an estimated 112 million animals[43]—including dogs, cats, mice, rats, frogs, rabbits, hamsters, guinea pigs, monkeys, sheep, fish, and birds—are used in U.S. laboratories for curiosity-driven and often bizarre and old-fashioned experimentation, chemical, drug, food, and cosmetics testing, biology lessons, and training using techniques, procedures, and methodologies that have long been shown to be outdated and unreliable.

84.    Before being killed when the grant money runs out or when their usefulness for experimentation ends, animals in laboratories are frequently tormented by restraints, such as tight plastic cylinders, and by experimental protocols in which experimenters, for example, force them to inhale toxic fumes, keep them immobilized for hours, drill holes into their skulls, electro-ejaculate them, burn their skin off, or crush their spinal cords, and other tortures.

85.    In addition to the torment of the actual experiments, animals in laboratories are deprived of everything that is natural and important to them—they are confined to barren cages, socially isolated, and psychologically traumatized.    These intelligent, social, complex, and sensitive animals are treated as disposable laboratory equipment and live in fear when anybody approaches.

86.    A recent study published in *Scientific Reports* demonstrates that the artificial and impoverished living conditions inside a laboratory render the data collected from rhesus macaques

---

[43] Because of a lack of transparent figures for species not covered by the Animal Welfare Act, such as horses, birds, and small mammals such as rats and mice bred for laboratories, only estimates are available. Larry Carbone, *Estimating Mouse and Rat Use in American Laboratories by Extrapolation From Animal Welfare Act–Regulated Species*, 11 SCI. REP. 493 (2021) (estimating 111.5 million rats and mice were used and killed in experiments per year circa 2017-18), available at https://doi.org/10.1038/s41598-020-79961-0.

in these labs problematic.[44]  Scientists have known for years that solitary confinement of monkeys increases the likelihood that they will engage in stereotypical and self-injurious behavior indicative of loneliness, anxiety, and depression—including pacing, rocking, pulling out their hair, biting their flesh, and picking at their wounds.  Monkeys housed alone often show increased levels of the stress hormone cortisol, increased inflammation, suppression of their immune systems, and slower wound healing.

87.    Through their taxes, members of the public are the ones who—knowingly or unknowingly—fund experiments on animals at NIH, NIMH, and the myriad laboratories funded by NIH.

88.    Approximately 47 percent of NIH-funded research involves experimentation on animals,[45] and in 2023, NIH budgeted some $21.6 billion for animal experimentation.[46]

89.    These experiments continue with little to no independent government oversight.

90.    The vast majority of experiments on animals do not contribute to improving human health, and the value of the role that animal experimentation plays in most medical advances is questionable at best.

91.    Symptoms of conditions artificially simulated in animals in laboratories, whether macaques, mice, or other animals, are not identical to those that occur naturally in human beings

---

[44] Joey A. Charbonneau, David G. Amaral, and Eliza Bliss-Moreau, *Social Housing Status Impacts Rhesus Monkeys' Affective Responding in Classic Threat Processing Tasks*, 12:4140 SCI. REP. 1, 2-9 (2022) (Individually-housed monkeys may exhibit a depression-like phenotype which affects their reactivity to stimuli, confounding study results.), available at https://doi.org/10.1038/s41598-022-08077-4.
[45] Institute of Medicine and National Research Council, *International Animal Research Regulations: Impact on Neuroscience Research: Workshop Summary*, at 23, EMERGING LEGAL TRENDS IMPACTING ANIMAL RESEARCH (2012) ("Snyder calculated that about 47 percent of NIH-funded grants have an animal research-based component."), available at https://doi.org/10.17226/13322.
[46] *See* Kavya Sekar, Cong. Rsch. Serv., R43341, *National Institutes of Health (NIH) Funding: FY1996-FY2023* (updated Mar. 8, 2023), at Summary (About 94 percent of NIH funding goes to extra- and intramural research. The 2023 budget was $49.183 billion.), available at https://crsreports.congress.gov/product/pdf/R/R43341/45.

due to vast differences in physiology, metabolism, and more. This renders the experiments wasteful and inapplicable to the human condition in any meaningful way. Moreover, many of the maladies, diseases, and other illnesses inflicted on animals in experiments do not naturally occur in or afflict those animals.

*Former NIH and NIMH Directors, and Other Industry Figures, Admit that Experimenting on Animals Does Not Work.*

92. Former NIH Director Dr. Elias Zerhouni acknowledged that experimenting on animals has been a boondoggle. "We have moved away from studying human disease in humans," he lamented at a 2013 scientific review management board meeting. "We all drank the Kool-Aid on that one, me included. … The problem is that it hasn't worked, and it's time we stopped dancing around the problem. … We need to refocus and adapt new methodologies for use in humans to understand disease biology in humans."[47]

93. Former NIH Director Dr. Francis Collins likewise succinctly summarized experiments on animals: "It's slow. It's expensive …We are not rats, and we are not even other primates … After all, ultimately, what you are looking for is, does this compound do damage to cells? Can we, instead of looking at a whole animal, look at cells from different [human] organs?"[48] And, "[w]ith earlier and more rigorous target validation in human tissues, it may be justifiable to skip the animal model assessment of efficacy altogether."[49]

94. In an article published in *The Journal of the American Medical Association*, researchers found that medical treatments developed in animals rarely translated to humans and

---

[47] Rich McManus, *Ex-Director Zerhouni Surveys Value of NIH Research*, Vol. LXV, No. 13, NIH Rec. 1, 7 (2013), available at https://nihrecord.nih.gov/sites/nihrecord/files/pdf/2013/NIH-Record-2013-06-21.pdf.
[48] Maggie Fox, *Government Labs Try Non-Animal Testing*, REUTERS (Feb. 14, 2008, 2:23 PM), https://www.reuters.com/article/idUSN14460337/.
[49] Francis S. Collins, *Reengineering Translational Science: The Time Is Right*, Vol 3., Issue 90 SCI. TRANSLATIONAL MED. 1, 3 (2011).

warned that "patients and physicians should remain cautious about extrapolating the findings of prominent animal research to the care of human disease ... poor replication of even high-quality animal studies should be expected by those who conduct clinical research."[50]

95.    Despite decades of developing HIV vaccines in animals—approximately 100 of them—still none are currently available for humans.[51]  According to a report in the British newspaper *The Independent*, a conclusion from one failed study was that "testing HIV vaccines on monkeys before they are used on humans, does not in fact work."[52]

96.    According to Joshua Gordon, former director of NIMH: "First and foremost, we must realize that there is no such thing as a true animal model of a psychiatric disorder." He went on to say that animal models of human disorders can be "problematic for many reasons, not the least of which is low statistical rigor, given that positive publication bias coupled with multiple tests can often lead investigators (and those that follow) astray."[53]

97.    Former NIMH Director, Tom Insel, summed up his experience at NIMH as follows: "I spent 13 years at NIMH really pushing on the neuroscience and genetics of mental disorders, and when I look back on that I realize that while I think I succeeded at getting lots of really cool papers published by cool scientists at fairly large costs—I think $20 billion—I don't think we moved the needle in reducing suicide, reducing hospitalizations, improving recovery for the tens of millions of people who have mental illness."[54]

---

[50] Daniel G. Hackam and Donald A. Redelmeier, *Translation of Research Evidence From Animals to Humans*. 296(14) JAMA 1731-32 (2006), available at 10.1001/jama.296.14.1731.
[51] *History of HIV Vaccine Research*, NIH: NIAID (Oct. 22, 2018), available at https://perma.cc/7GMG-G7MY.
[52] Steve Connor, *Is it Time to Give up the Search for an AIDS Vaccine?*, THE INDEPENDENT (Apr. 24, 2008), available at https://perma.cc/FUR5-W5G7.
[53] Joshua Gordon, *A Hypothesis-Based Approach: the Use of Animals in Mental Health Research*, NIMH Director's Messages (Oct. 21, 2019), available at https://perma.cc/BW55-KH3R.
[54] Adam Rogers, *Star Neuroscientist Tom Insel Leaves the Google-Spawned Verily for.... A Startup?*, Wired (May 11, 2017, 3:16 PM), available at https://perma.cc/TRZ2-LMSL.

98.     Former NIMH Director Steven Hyman acknowledged that "we cannot expect to produce veridical models of human brain disorders in animals, and scientists must take care to avoid anthropomorphizing[,]" citing the development of treatments for depression as a prime example. [55]

99.     Hyman has also written that:

> Ultimately it is the humans who have the disease, not the mice.  I would argue that we should stop trying to validate mouse or other animal models of disease; instead we should perform basic investigations and then attempt to validate candidate disease mechanisms in human patients where possible, recognizing that attention must also be paid to strengthening experimental human biology… human vulnerability to these and other psychiatric disorders is conditioned upon complex genetic and developmental risk factors and involves decision-making in a world of rich choices, which differs vastly from the situation of laboratory animals.  The information gleaned about reward and fear circuitry is invaluable for attempts to develop new treatments.  However, to take one arbitrary example, to anoint rodents engineered or trained to avidly self-administer drugs as a model of addiction risks leading translational neuroscience astray.  This is because, at a minimum, such 'models' are too reductive, the critical brain structures too evolutionarily distant and they would fail to capture relevant human risk genotypes…[56]

*Published Results of Experiments on Animals Are Often Intentionally Misleading.*

100.     Research published in the journal *Annals of Internal Medicine* revealed that universities commonly exaggerate findings from experiments on animals conducted in their laboratories and "often promote research that has uncertain relevance to human health and do not provide key facts or acknowledge important limitations."[57]

---

[55]Kris Dickson, *A Conversation with Steve Hyman About Animal Models for Autism Research*, Simons Foundation (Dec. 13, 2021), available at https://perma.cc/8NYD-HGDP.

[56] Steven E. Hyman, *Back to Basics: Luring Industry Back Into Neuroscience*, Vol. 19, Issue 11, Nature Neurosci. 1383-84 (Oct. 26, 2016), available at https://www.nature.com/articles/nn.4429.

[57] Steven Woloshin, Lisa M. Schwartz *et al.*, *Press Releasees by Academic Medical Centers: Not So Academic?*, 150 Annals of Internal Med. 613 (2009), available at https://www.acpjournals.org/doi/10.7326/0003-4819-150-9-200905050-00007.

101.    One study of media coverage of scientific meetings concluded that news stories often omit crucial information and that "the public may be misled about the validity and relevance of the science presented."[58]

102.    Because experimenters often elect not to publish, or intentionally keep secret the results of failed animal studies, other scientists and the public do not have ready access to information on the ineffectiveness of animal experimentation.

### First Cause of Action

*Deprivation of Rights Under the First Amendment of the U.S. Constitution*

103.    PETA incorporates by reference each of the foregoing paragraphs in this Complaint.

104.    Defendants' actions, as alleged herein, constitute state action and agency action. At all relevant times, Defendants Dr. Avenevoli and Dr. Memoli were acting under color of federal law as employees of the Defendants NIMH and NIH, respectively.

105.    The First Amendment of the United States Constitution guarantees the right to receive communications from willing speakers. U.S. Const. amend. I; *see, e.g.*, *Va. State Bd.*, 425 U.S. at 757 n.15. This right exists regardless of whether the speakers themselves—here, the rhesus macaques—possess First Amendment rights.  *See Lamont*, 381 U.S. at 308   (Brennan, J., concurring). This right also extends to protect the rhesus macaques' non-verbal communications as speech under the First Amendment.  *See Heyer*, 849 F.3d at 218; *see also Holloman*, 370 F.3d at 1270.

106.    On October 1, 2024, Defendants, through their lawyer, personally denied PETA's request to open a channel of communication between PETA and Beamish, Sam Smith, Guinness,

---

[58] Steven Woloshin and Lisa Schwartz, *Media Reporting on Research Presented at Scientific Meetings: More Caution Needed*, 184 MED. J. OF AUSTL. 576-80 (2006), available at https://pubmed.ncbi.nlm.nih.gov/16768666/.

and Nick Nack, captive primates in Murray's NIH laboratory—violating PETA's First Amendment rights to receive communications from willing speakers, the rhesus macaques held captive and tortured in her laboratory. Defendants also denied PETA's request to cooperate on finding any reasonable alternative solutions to timely, uncensored access to the macaques' communications.

107. Defendants' violation of PETA's First Amendment rights was not rationally related to any compelling, legitimate, or neutral government purpose. In particular, the live-streaming that PETA seeks would not pose any risk or inflict any damage on the rhesus macaques or the facilities where they are housed.

108. As a result of Defendants' acts and/or omissions, PETA has suffered damages, including but not limited to violations of its First Amendment right to communicate with the macaques. These violations of PETA's First Amendment rights are particularly detrimental to PETA's role in promoting transparency of animal treatment through journalism. *See N.C. Farm Bureau*, 60 F.4th at 829 ("The right to gather information plays a distinctly acute role in journalism. First-hand accounts, buttressed by video evidence, enhance accuracy and credibility in reporting and increase transparency and reader trust, allowing the press 'to tell more complete and powerful stories'"). Indeed, journalism serves a particularly powerful function under the First Amendment when seeking access to incarcerated beings whose voices are otherwise silenced. *See Thornburgh*, 490 U.S. at 407; *see also Cal. First Amend. Coal.*, 299 F.3d at 873. Defendants' censorship thus causes ongoing and irreparable harm to PETA's exercise of its constitutional rights.

109. There is no alternative federal or state remedy available to Plaintiff for these constitutional violations. Likewise, Plaintiff has no alternative means to receive communications

from the rhesus macaques held captive by Defendants, or to provide important information to the public based on such communications.

110.    There also exists a substantial threat that Defendants' violations of PETA's First Amendment rights will continue—indeed, such continued violations are inevitable without this Court's intervention.

## Second Cause of Action

*Deprivation of Rights Under the Fifth Amendment of the U.S. Constitution*

111.    PETA incorporates by reference each of the foregoing paragraphs in this Complaint.

112.    Defendants' actions, as alleged herein, constitute state action and agency action. At all relevant times, Defendants Dr. Avenevoli and Dr. Memoli were acting under color of federal law as employees of the National Institute of Mental Health and National Institutes of Health, respectively.

113.    On October 1, 2024, Defendants, through their lawyer, personally denied PETA's request to open a channel of communication between PETA and Beamish, Sam Smith, Guinness, and Nick Nack, captive primates in Murray's NIH laboratory—depriving PETA of constitutionally protected liberty and property interests.

114.    Defendants effected these deprivations without due process of law, required by the Fifth Amendment of the Constitution, because they failed to provide PETA with timely and adequate notice and an opportunity to be heard.

115.    Specifically, Defendants deliberately rejected PETA's request to provide it with real-time audiovisual communication with the rhesus macaques held captive at their facility; provided perfunctory explanations for why certain existing videos could not be transmitted; failed to provide any explanation for why other access could not be provided; and included no details

for how PETA could appeal Defendants' rejection. Defendants also denied PETA's request to cooperate on finding any reasonable alternative solutions to timely, uncensored access to the macaques' communications.

116.    Defendants' failure to provide due process to PETA regarding its request to receive communications from the rhesus macaques is deliberate.

117.    There exists a substantial threat that Defendants will continue to deny PETA timely and adequate notice and an opportunity to be heard—indeed, such continued denials are inevitable without this Court's intervention.

118.    Accordingly, Defendants' failure to provide adequate notice causes ongoing and irreparable harm to PETA's constitutional rights, for which there is no adequate remedy at law.

**Prayer for Relief**

PETA respectfully requests that this Court:

1.    Declare that Defendants' refusal to allow PETA reasonable, uncensored, and unedited access to a live-streamed audiovisual feed of the communications from the rhesus macaques in Murray's laboratory violates the First Amendment;

2.    Declare that Defendants' refusal to provide adequate explanation and notice of the denial, as well as a means of appeal, violates the Fifth Amendment;

3.    Order Defendants to provide PETA with such access to the rhesus macaques' communications in Murray's laboratory within thirty (30) days of this Court's Order;

4.    Permanently enjoin Defendants, and their officers, employees, and agents, from violating the First Amendment by withholding from PETA such access to the rhesus macaques' communications in Murray's laboratory;

5.    Permanently enjoin Defendants, and their officers, employees, and agents, from violating the Fifth Amendment by failing to provide adequate due process;

6.    Award PETA its reasonable costs and attorneys' fees; and

7.    Order such further relief as the Court deems just and proper.

Dated: March 6, 2025                              Respectfully submitted:

                                                  /s/*Laura R. Handman* (D. Md. Bar No. 15522)

                                                  DAVIS WRIGHT TREMAINE LLP
                                                  Chelsea T. Kelly (*pro hac vice forthcoming*)
                                                  1301 K Street NW, Suite 500 East
                                                  Washington, D.C. 20005
                                                  Telephone: (202) 973-4273
                                                  Facsimile: (202) 973-4499
                                                  Primary: laurahandman@dwt.com
                                                  Primary: chelseakelly@dwt.com

                                                  Caesar Kalinowski IV (*pro hac vice forthcoming*)
                                                  920 Fifth Avenue, Suite 3300
                                                  Seattle, Washington 98104
                                                  Telephone: (206) 757-8232
                                                  Primary: caesarkalinowski@dwt.com

                                                  PETA FOUNDATION
                                                  Jeffrey Kerr (*pro hac vice forthcoming*)
                                                  Asher Smith (*pro hac vice forthcoming*)
                                                  Ashley Ridgway (*pro hac vice forthcoming*)
                                                  501 Front Street
                                                  Norfolk, VA 23510
                                                  Telephone: (757) 622-7382
                                                  Primary: jeffk@petaf.org
                                                  Primary: ashers@petaf.org
                                                  Primary: ashleyr@petaf.org

                                                  *Counsel for Plaintiff People for the Ethical Treatment of Animals, Inc.*

[36]